**RIGRODSKY LAW, P.A.**
Gina M. Serra (#361172)
1091 North Palm Canyon Drive, Suite 9
Palm Springs, CA 92262
Telephone: (760) 406-8009
Email: gms@rl-legal.com

*Attorneys for Plaintiff*

[Additional Counsel on Signature Page]

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| NATHAN C. SILVA, Derivatively on Behalf of Nominal Defendant SNAP, INC., <br><br> Plaintiff, <br><br> v. <br><br> EVAN SPIEGEL, ROBERT MURPHY, MICHAEL LYNTON, KELLY COFFEY, JOANNA COLES, ELIZABETH JENKINS, JIM LANZONE, SCOTT D. MILLER, PATRICK SPENCE, POPPY THORPE, FIDEL VARGAS, and DEREK ANDERSEN, <br><br> Defendants, <br><br> and <br><br> SNAP, INC., <br><br> Nominal Defendant. | Case No. _____ <br><br> **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** <br><br> **DEMAND FOR JURY TRIAL** |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Nathan C. Silva ("Plaintiff"), by and through his undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant Snap, Inc. ("Snap" or the "Company"), against current and former members of the Company's Board of Directors (the "Board") and certain of its executive officers, seeking to remedy violations of federal and state law by the Individual Defendants

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

(as defined below).  Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Defendants' publicly available documents, filings with the United States Securities and Exchange Commission ("SEC"), press releases published by and regarding Snap, legal filings, news reports, securities analysts' reports about the Company, the securities class action *Abdul-Hameed v. Snap, Inc. et al.,* Case No. 2:25-cv-07844 (C.D. Cal.) (the "Securities Class Action"), and other publicly available information.

## NATURE OF THE ACTION

1. This is a shareholder derivative action brought by Plaintiff on behalf of Snap against certain of its officers and current and former members of the Company's Board for their violations of the federal securities laws and violations of state law, including breach of their fiduciary duties, between at least April 29, 2025 and August 5, 2025, inclusive (the "Relevant Period"), and violations of the federal securities laws, as set forth below.

2. Snap is an American technology and social media company best known for the mobile application, Snapchat, a multimedia messaging platform that allows users to send photos, videos, and messages.

3. Throughout the Relevant Period, Company management issued materially false and misleading statements, failing to disclose that there was a significant issue with the Company's ad auction system and that Snap lacked reliable information concerning the Company's expected advertising revenue.

4. The truth emerged on August 5, 2025, when Snap reported disappointing financial results for the second quarter of 2025, partially attributable to "an issue related to [Snap's] ad platform."

2

5. On this news, the price of Snap stock declined 17.15%, from a close of $9.39 per share on August 5, 2025 to a close of $7.78 per share on August 6, 2025.

6. As a direct and proximate result of the misconduct detailed herein, the Company has incurred significant financial losses, including the cost of defending itself, and potentially, incurring class-wide damages, in the Securities Class Action, as well as additional losses in market capitalization, reputational harm and the loss of goodwill.

7. Moreover, in light of the breaches of fiduciary duty by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and the Securities Class Action, and that the Individual Defendants are beholden to each other based on their longstanding business and personal relationships, the Individual Defendants do not possess the requisite level of disinterestedness and independence to consider a demand to commence litigation against themselves and the other Individual Defendants on behalf of the Company. Accordingly, Plaintiff did not make a demand on the Board because, as further detailed herein, demand would be a futile and useless act.

## JURISDICTION AND VENUE

8. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act") over the claims asserted herein for violations of Section 10(b) of the Exchange Act and Rule 10b-5 (17 C.F.R.§240.10b-5), promulgated thereunder by the SEC.

9. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

10. This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

11.    In connection with the acts, conduct and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

12.    Venue is proper in this District pursuant to Section 27(a) of the Exchange Act and 28 U.S.C. § 1391 because Snap is headquartered in this District, Defendants have conducted business in this District, a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Securities Class Action is pending in this District.

## PARTIES

*Plaintiff*

13.    Plaintiff is, and has been at all relevant times, a shareholder of Snap.

*Nominal Defendant*

14.    Nominal Defendant Snap is incorporated under the laws of Delaware and maintains its principal executive offices at 3000 31st Street, Santa Monica, California 90405. Snap's common stock is traded on the New York Stock Exchange ("NYSE") under the ticker symbol "SNAP."

*Individual Defendants*

15.    Defendant Evan Spiegel ("Spiegel") co-founded Snap and has served as Chief Executive Officer ("CEO") and as a member of the Board since 2012. Defendant Spiegel is named as a defendant in the Securities Class Action. According to the Company's public filings, Defendant Spiegel received $3,298,781 in 2024 in compensation from the Company. As of December 31, 2024, Defendant Spiegel beneficially owned 39,063,540 shares of Class A common stock, 5,862,410 shares of Class B common stock, and 123,683,019 shares of Class C common stock, worth

4

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

roughly $1.82 billion,[1] which gives Defendant Spiegel 53.1% of the total voting power in the Company.

16. Defendant Robert Murphy ("Murphy") co-founded Snap and has served as Chief Technology Officer and as a member of the Board since 2012. According to the Company's public filings, Defendant Murphy received $1,035,164 in 2024 in compensation from the Company. As of December 31, 2024, Defendant Murphy beneficially owned 67,170,682 shares of Class A common stock, 5,862,410 shares of Class B common stock, and 107,943,924 shares of Class C common stock, worth roughly $1.95 billion, qwhich gives Defendant Murphy 46.4% of the total voting power in the Company. The Company's 2024 annual report, filed on Form 10-K with the SEC on February 5, 2025 (the "2024 10-K"), stated the following with respect to Snap's capital structure and the control that Defendants Murphy and Spiegel exercise over the Company:

> Class A common stockholders have no voting rights, unless required by Delaware law. As a result, all matters submitted to stockholders will be decided by the vote of holders of Class B common stock and Class C common stock. As of December 31, 2024, Mr. Spiegel and Mr. Murphy control over 99% of the voting power of our capital stock, and Mr. Spiegel alone may exercise voting control over our outstanding capital stock. Mr. Spiegel and Mr. Murphy voting together, or in many instances, Mr. Spiegel acting alone, will have control over all matters submitted to our stockholders for approval.

17. Defendant Michael Lynton ("Lynton") has served as a member of the Board since 2013 and as Chairperson of the Board since 2016. Defendant Lynton

---

[1] Valuations of the Individual Defendants' personal holdings of Snap Class A common stock are calculated based on the $10.77 per share closing price of Snap common stock on December 31, 2024. Further, the valuations assume that the fair market value of Snap Class B common stock and Class C Common stock, which are not listed on any securities exchange, are equal to the fair market value of Snap Class A common stock, as each share of Class B common stock is convertible into one share of Class A common stock at any time at the option of the holder, and each share of Class C common stock is convertible into one share of Class B common stock at any time at the option of the holder.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

serves as Chair of the Compensation Committee and as a member of the Audit Committee and the Nominating and Corporate Governance Committee. According to the Company's public filings, Defendant Lynton received $397,718 in 2024 in compensation from the Company. As of December 31, 2024, Defendant Lynton beneficially owned 587,456 shares of Snap Class A common stock, worth roughly $6.3 million.

18.    Defendant Kelly Coffey ("Coffey") has served as a member of the Board since 2020 and serves as a member of the Audit Committee. According to the Company's public filings, Defendant Coffey received $302,718 in 2024 in compensation from the Company. As of December 31, 2024, Defendant Coffey beneficially owned 73,661 shares of Snap Class A common stock, worth roughly $793,329.

19.    Defendant Joanna Coles ("Coles") has served as a member of the Board since 2015 and serves as Chair of the Nominating and Corporate Governance Committee. According to the Company's public filings, Defendant Coles received $312, 718 in 2024 in compensation from the Company. As of December 31, 2024, Defendant Coles beneficially owned 102,454 shares of Snap Class A common stock, worth roughly $1.1 million.

20.    Defendant Elizabeth Jenkins ("Jenkins") has served as a member of the Board since 2020 and serves as Chair of the Audit Committee. According to the Company's public filings, Defendant Jenkins received $327,718 in 2024 in compensation from the Company. As of December 31, 2024, Defendant Jenkins beneficially owned 46,411 shares of Snap Class A common stock, worth roughly $499,846.

21.    Defendant Jim Lanzone ("Lanzone") has served as a member of the Board since 2024 and serves as a member of the Nominating and Corporate

6

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Governance Committee. According to the Company's public filings, Defendant Lanzone received $258,492 in 2024 in compensation from the Company.

22. Defendant Scott D. Miller ("Miller") has served as a member of the Board since 2016 and serves as a member of the Audit Committee and the Compensation Committee. According to the Company's public filings, Defendant Miller received $325,300 in 2024 in compensation from the Company. As of December 31, 2024, Defendant Miller beneficially owned 189,357 shares of Snap Class A common stock, worth roughly $2.0 million.

23. Defendant Patrick Spence ("Spence") has served as a member of the Board since 2023 and serves as a member of the Compensation Committee. According to the Company's public filings, Defendant Spence received $302,718 in 2024 in compensation from the Company. As of December 31, 2024, Defendant Spence beneficially owned 22,718 shares of Snap Class A common stock, worth roughly $244,673.

24. Defendant Poppy Thorpe ("Thorpe") has served as a member of the Board since 2018 and serves as a member of the Audit Committee and the Compensation Committee. According to the Company's public filings, Defendant Thorpe received $362,718 in 2024 in compensation from the Company. As of December 31, 2024, Defendant Thorpe beneficially owned 109,817 shares of Snap Class A common stock, worth roughly $1.2 million.

25. Defendant Fidel Vargas ("Vargas") has served as a member of the Board since 2021 and serves as a member of the Nominating and Corporate Governance Committee. According to the Company's public filings, Defendant Vargas received $362,718 in 2024 in compensation from the Company. As of December 31, 2024, Defendant Vargas beneficially owned 53,568 shares of Snap Class A common stock, worth roughly $576,927.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

*Officer Defendant*

26. Defendant Derek Andersen ("Andersen") has served as Snap's Chief Financial Officer ("CFO") since 2019. Defendant Andersen initially joined the Company as Vice President of Finance in 2018. Defendant Andersen is named as a defendant in the Securities Class Action. According to the Company's public filings, Defendant Andersen received $7,771,413 in 2024 in compensation from the Company. As of December 31, 2024, Defendant Andersen beneficially owned 800,589 shares of Snap Class A common stock, worth roughly $8.6 million.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

27. By reason of their positions as officers and/or directors of Snap, and because of their ability to control the business and corporate affairs of Snap, the Individual Defendants owed Snap and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Snap in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Snap and its shareholders so as to benefit all shareholders equally.

28. Each director and officer of the Company owes to Snap and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligation of fair dealing.

29. The Individual Defendants, because of their positions of control and authority as directors and/or officers of Snap, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

30. To discharge their duties, the officers and directors of Snap were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

8

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

31.    Each Individual Defendant, by virtue of his or her position as a director and/or officer owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of Snap, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

32.    As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty: to ensure that Snap implemented and properly monitored the Company's internal controls over financial reporting; to prevent the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, financial statements, products, management, internal controls, earnings, and present and future business prospects, including the dissemination of false and/or materially misleading information regarding the Company's business, prospects, and operations; and to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful, accurate, and fairly presented information.

33.    To discharge their duties, the officers and directors of Snap were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties,

9

the officers and directors of Snap were required to, among other things:

(a) ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware and the United States, and pursuant to Snap's own Code of Conduct;

(b) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) remain informed as to how Snap conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d) establish and maintain systematic and accurate records and reports of the business and internal affairs of Snap and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e) maintain, implement, and monitor an adequate and functioning system of internal legal, financial, and management controls, such that Snap's publicly disclosed financial information would be accurate;

(f) exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required

10

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

by law to disseminate;

(g) refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h) examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

34.     Each of the Individual Defendants further owed to Snap and the shareholders the duty of loyalty requiring that each favor Snap's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

35.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Snap and were at all times acting within the course and scope of such agency.

36.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Snap.

**CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

37.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

assisted each other in breaching their respective duties.

38.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment.

39.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company, purposefully, recklessly, or negligently, to conceal material facts, fail to correct such misrepresentations, and violate applicable laws.

40.     In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants, who are directors of Snap, was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

41.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

42.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Snap and at all times acted within the course and scope of such agency.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## SNAP'S CODE OF CONDUCT

43.    Snap's Code of Conduct begins with a message from Defendant Spiegel which states, in pertinent part:

At Snap, being kind is one of our core values. We don't disrupt things first and fix them later; we bring care and long-term thinking into how we solve problems from the start. That's why we designed our technology around humans, trying to give our online community a way to express their full experience with friends and foster real connection. We bring the same empathy and insight to our other business stakeholders: our team, our partners, our investors, and the broader world.

When our stakeholders thrive, so do we. That's why this Code of Conduct is built around that core value. Our standard for good business conduct is not just following the law; it's also treating our stakeholders the right way. Kindness is not a constraint on our growth; it's a driver.

44.    The Code of Conduct applies to "[e]veryone who works for Snap, from team members to interns to officers and directors," and violations of the Code of Conduct "may result in disciplinary action up to and including termination of employment."

45.    The Code of Conduct states the following with respect to the responsibilities of the Company's officers and directors:

Directors, officers, and Integrity & Compliance executives bear special responsibility for following this Code. In the event of an alleged violation by any of those individuals, the General Counsel (or the CEO, if the General Counsel is implicated) will be informed and will ensure an appropriate investigation and appropriate discipline for any violation.

46.    With respect to conflicts of interest, the Code of Conduct states, in pertinent part:

We are a community of kind, smart, and creative people with a wide range of outside interests. It's our job to manage those outside interests responsibly and with respect for our commitment to the company. That means we avoid situations where what's best for us personally conflicts with what's best for Snap. When we all put Snap first, we build trust and honor the work and efforts of our colleagues. By contrast, when we introduce conflicts of interest, we undermine trust and we put each other in uncomfortable positions.

13

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

47.    In a subsection titled "Keep Accurate Records and Contracts," the Code of Conduct states, in pertinent part:

Our commitment to honesty is reflected in how we keep business records. Those records come in all shapes and sizes, from receipts to contracts to our user engagement metrics and published financials. Whatever the type of record, we apply the same approach: we are truthful, transparent, and accurate in our documentation. That's the kind of company that investors and the public can trust.

*        *        *

- We record all business activities accurately and honestly. We do not engage in any activities that would cause those records to be misleading.

*        *        *

- We always record user engagement metrics, partner metrics, and financial data accurately. We never knowingly falsify, misstate, mischaracterize, or otherwise inaccurately represent those metrics or financials.

- We immediately notify Risk Advisory Partners (RAP) or Integrity & Compliance if we learn of anything that might cause inaccuracies in our public filings or statements.

48.    In a subsection titled "Make Truthful and Accurate Public Statements," the Code of Conduct states, in pertinent part:

Investors, Customers, and Partners need to trust what we say because they make financial and business decisions based on our disclosures. We take that trust seriously and avoid making misleading public statements, particularly those related to our finances, user engagement metrics, and any other data about the company. Likewise, we are truthful and honest when communicating with third parties about our business.

*        *        *

- We prepare complete, timely, and accurate financial reports.

*        *        *

- When we communicate with third parties, we always give honest and accurate information about our business, Our designated spokespeople follow our corporate disclosure rules.

14

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

- We do not misstate, mischaracterize, or otherwise inaccurately represent Snap data. We follow the company's data review and approval processes before releasing any data externally. (See Related Policies sidebar links.)

- We ensure any research we publish is truthful and accurate.

49.    In a subsection titled "Compete Fairly," the Code of Conduct states, in pertinent part:

Everyone benefits when there is a competitive marketplace. We protect that interest by competing according to the rules. We get ahead by being kind, smart, and creative, not by engaging in unfair or unethical business practices.

*        *        *

- We ensure that any public statements we make about our competitors or the industry are true and not misleading, deceptive, or fraudulent.

50.    With respect to Snap's corporate assets, the Code of Conduct states, in pertinent part, that "[w]e also demonstrate our integrity by respecting Snap's property. That property is meant to benefit our investors and other stakeholders, not us personally. We are responsible and honest when handling and protecting Snap's property, including money, corporate information, physical property and goods, intellectual property, and other belongings."

51.    With respect to legal and regulatory compliance, the Code of Conduct states that "[w]e follow all applicable governmental laws, rules, and regulations."

## SNAP'S AUDIT COMMITTEE CHARTER

52.    Pursuant to Snap's Audit Committee Charter, the purpose of the Audit Committee is to assist the Board in its oversight of:

- help the Board of Directors oversee Snap's corporate accounting and financial reporting processes, systems of internal control, and financial statement audits;

- manage the selection, engagement terms, fees, qualifications, independence, and performance of the registered public

15

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

accounting firms engaged as Snap's independent outside auditors for the purpose of preparing or issuing an audit report or performing any services;

- review any reports or disclosures required by applicable rules and regulations of the Securities and Exchange Commission (the "SEC") and any applicable stock exchange;

- oversee certain risk exposures and to assist the Board in fulfilling its oversight responsibilities relating to risk assessment and management;

- oversee the organization and performance of Snap's internal audit function; and

- provide regular reports and information to the Board with respect to material issues.

53. The Audit Committee Charter tasks the Audit Committee with the following responsibilities:

***Financial Review and Disclosure:***

- **Annual Audit Results.** The Audit Committee will review with Snap management and the independent auditors the results of the annual audit, including:

  o the independent auditors' assessment of the quality of Snap's accounting principles and practices;

  o the independent auditors' views about qualitative aspects of Snap's significant accounting practices, the reasonableness of significant judgments, and estimates (including material changes in estimates and analyses of the effects of alternative generally accepted accounting principles ("GAAP") methods on the financial statements);

  o all known and likely misstatements identified during the audit (other than those the independent auditors believe to be trivial);

  o the adequacy of the disclosures in the financial statements; and

  o any other matters that the independent auditors must communicate to the Audit Committee under applicable accounting or auditing standards.

- **Audited Financial Statement Review; Quarterly and Annual Reports.** The Audit Committee will review the annual audited

16

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

financial statements and quarterly financial statements with Snap management and the independent auditors. The Audit Committee will be responsible for recommending to the Board whether the proposed annual audited financial statements should be included in Snap's Annual Report on Form 10-K.

- **Earnings Announcements.** The Audit Committee will review and discuss with Snap management and the independent auditors any earnings press releases and other financial information regarding Snap's results of operations.

- **Proxy Report.** The Audit Committee will oversee the preparation of any report required by applicable rules and regulations to be included in any Snap proxy statement.

- **Accounting Principles and Policies.** The Audit Committee will review and discuss with Snap management and the independent auditors significant issues regarding accounting principles and financial-statement presentation, including:

  o critical accounting policies and practices;

  o alternative accounting policies available under GAAP;

  o the potential impact on Snap's financial statements of alternative treatments; and

  o any other significant reporting issues and judgments, significant regulatory, legal, and accounting initiatives, or developments that may have a material impact on Snap's financial statements, compliance programs, and policies.

The Audit Committee will review with the independent auditors and Snap management, if appropriate, any written communication, such as any management letter or internal-control letter, before the independent auditors issue it and before management responds to the communication.

- **Management Cooperation with Audit.** The Audit Committee will evaluate Snap management's cooperation with the independent auditors during their audit examination, including any significant difficulties or disagreements encountered during the audit, if any. The Audit Committee will resolve any conflicts or disagreements regarding financial reporting.

*Internal Controls and Procedures:*

- **Risk Assessment and Management.** The Audit Committee will review and discuss with Snap management and the independent auditors Snap's policies on financial risk management and assessment. The Audit Committee will provide regular reports to the Board about material issues affecting the quality or integrity of Snap's financial statements, compliance with legal or

17

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

regulatory requirements, the performance or independence of the independent auditors, the performance of Snap's internal audit function, and other matters as the Audit Committee deems appropriate.

- **Internal Auditors.** The Audit Committee will review the audit plan of Snap's internal auditor and discuss with that team the adequacy and effectiveness of Snap's scope, staffing, and general audit approach. The Audit Committee will review any significant reports prepared by Snap's internal auditors, as well as management's response. The head of Snap's internal auditors will also report to and be evaluated by the Audit Committee.

- **Internal Control over Financial Reporting; Disclosure Controls.** The Audit Committee will confer with Snap management and the independent auditors concerning the scope, design, adequacy, and effectiveness of internal control over financial reporting and Snap's disclosure controls and procedures. The Audit Committee will review reports on significant findings and recommendations with respect to internal controls over financial reporting, together with management responses and any special audit steps adopted in light of any material control deficiencies. Periodically, the Audit Committee will meet in separate sessions with the independent auditors, Snap's internal auditors, and Snap management to discuss any matters that any of these parties believe should be discussed privately with the Audit Committee.

\* \* \*

- **Internal Control Report.** At least annually, the Audit Committee will review a report by the independent auditors describing any material issues raised by (i) that firm's internal quality-control review, (ii) any peer review of the firm's internal quality control review, or (iii) any inquiry or investigation by governmental or professional authorities conducted in the last five years of any audit performed by the independent auditors. As part of this annual review, the independent auditors' report will also describe any steps taken to address the issues raised.

\* \* \*

*Other Matters:*

- **Annual Audit Committee Evaluation.** The Audit Committee will annually evaluate its performance and the adequacy of this charter.

- **Other Legal and Finance Matters.** The Audit Committee will review with Snap management legal and regulatory compliance and any actual, pending, or threatened legal or financial matters that could significantly affect Snap's business or financial statements.

18

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## SUBSTANTIVE ALLEGATIONS

***Background***

54.    Snap is an American technology and social media company best known for its flagship app, Snapchat, a multimedia messaging platform that allows users to send photos, videos, and messages.

55.    Snapchat generates revenue primarily through the sale of advertising space. The Company tracks and reports both brand and direct response advertising revenue. Brand advertisers aim to build long-term brand awareness, while direct response advertisers aim to solicit an immediate action from the viewer, like clicking a link or downloading an app.

***Materially False and Misleading Statements During the Relevant Period***

56.    On April 29, 2025, Snap issued a press release, reporting its first quarter 2025 financial results. During a related earnings call, hosted by the Company on the same day (the "1Q25 Earnings Call"), Defendant Spiegel highlighted the purported growth in the Company's advertising revenue:

> In Q1, our community grew to 460 million daily active users, an increase of 38 million year-over-year, and content viewers and total time spent watching content grew year-over-year. Q1 revenue increased 14% year-over-year to $1.36 billion, driven by the progress we have made with our direct response advertising solutions, continued momentum in driving performance for small and medium-sized businesses and the growth of our Snapchat+ subscription business. The benefits of our more focused investments are now evident in our improved profitability and free cash flow generation.

> * * *

> Given the progress we have made with our advertising platform, and the pace of execution against our 2025 strategic priorities, we believe we are well positioned to deliver improved business performance and meaningful positive free cash flow as we make further progress towards GAAP profitability.

57.    During the 1Q25 Earnings Call, following his prepared remarks, Defendant Andersen stated:

19

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

In Q1, total revenue was $1.363 billion, up 14% year-over-year, and up 15% year-over-year on a constant currency basis. Advertising revenue was $1.211 billion, up 9% year-over-year, driven primarily by growth from DR advertising revenue, which increased 14% year-over-year.

Brand-oriented advertising revenue was down 3% year-over-year due to a combination of softness in upper funnel demand across all regions, as well as the ongoing shift in the mix of our advertising business toward performance-oriented advertising solutions. This mix shift is evident in the fact that direct response advertising revenue contributed 75% of our total advertising revenue for the first time in Q1.

* * *

North America revenue growth accelerated to 12% year-over-year in Q1, up from 8% in the prior quarter. With a faster growth rate in Q1, driven primarily by a higher rate of Direct Response advertising revenue growth. Europe revenue grew 14% year-over-year, and Rest of World revenue grew 20% year-over-year, with softer brand-oriented advertising demand in these regions, partially offsetting continued strong growth in Direct Response advertising revenue, and continued momentum in the SMB customer segment, in particular, in these regions.

58.    Defendant Andersen then stated the following with respect to management's expectations for the coming quarter:

Given the uncertainty with respect to how macroeconomic conditions may evolve in the months ahead, and how this may impact advertising demand more broadly, we do not intend to share formal financial guidance for Q2. ***While our top line revenue has continued to grow, we have experienced headwinds to start the current quarter, and we believe it is prudent to continue to balance our level of investment with realized revenue growth.[2]*** As a result, we are updating our full year cost structure guidance to reflect our current investment plans.

* * *

***While there is uncertainty regarding the macro operating environment, we remain optimistic about the long-term prospects for our business.*** We remain optimistic because of the progress we have made with our ad platform to improve performance for our advertising partners, because of the progress we have made to diversify our advertiser base as well as our revenue sources with the growth of Snapchat+. ***Because of our demonstrated ability to prioritize our cost structure to balance investment with top line growth over time***, and because we have built a strong balance sheet with the financial

---

[2] Unless indicated otherwise, all emphasis is added.

20

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

flexibility necessary to maintain strategic focus through volatile macro conditions.

Moving forward, we will remain focused on executing against our strategic priorities of growing our community and improving depth of engagement, driving top line revenue growth and diversifying our revenue sources, and building toward our long-term vision for augmented reality.

59.    Later in the 1Q25 Earnings Call, the following exchange occurred among several analysts and the Individual Defendants:

**Ross Adam Sandler – Barclays Bank PLC – MD of Americas Equity Research & Senior Internet Analyst**

Great. I got to ask the obligatory macro question. So I think everybody is curious what you guys are seeing thus far here in the second quarter on both brand and DR. It sounds like you're growing, but you're starting to see some impact. So I guess, could you just give us a little more color on what categories or what segments of the business are seeing an impact?

* * *

**Defendant Andersen**

. . . . At a high level, the macro is changing quickly. And I think the path we're concerned here going forward is an entirely clear that obviously impacts visibility on our end. We've learned from some of the big past macro events that we experienced in external events to be thoughtful about how this can impact the operating environment and therefore, our approach to guidance generally.

We've had a really solid Q1 top line growth at the very high end of our guide range and then both adjusted EBITDA and net income well above those ranges. So we started the year really strong. ***Thus far in Q2, we're still growing. But we've seen some headwinds to our top line growth so far.***

As one example, we've heard from a subset of advertisers that their spending has been impacted by the changes to the de minimis exemption. However, I caution here, it's just really difficult to parse the drivers between the various potential factors there. ***We're just really focused on continuing to execute for our customers and to build on the momentum we saw in Q1 with active advertisers up to 60%, DR advertising revenue reaching 70% of total ad revenue for the first time.***

* * *

**Richard Scott Greenfield – Lightshed Partners, LLC – Partner and Media & Technology Analyst**

21

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

I guess one of the big questions that everyone is trying to understand, you've been sort of in that mid-teens ish, low to mid-teens-ish growth rate for Direct Response advertising. The comp was definitely harder this quarter than it's been in a long time. But I think as you sort of look at the investments you've been making, the rollout of new products like Sponsored Snaps, what will it take to deliver 20-plus percent growth in the DR business?

Like do you have line of sight to like what needs to happen or how long it will take to sort of get that to be a 20-plus percent growth business? And then just 2 housekeeping things, Derek. One of the de minimis that you just mentioned, anything that you could say in terms of how much China-based advertisers is a percentage of your revenue?

And on the guidance comment, the forward-looking that April is continuing to grow, I've gotten a lot of questions. Is advertising growing? Or is it -- if you look -- excluding Snap+, is it still growing, excluding Snap+, as you look into April because everyone is trying to isolate what's happening in core ad business given everything that's happened with tariffs?

**Defendant Spiegel**

Yes. We're really excited about the progress we've been making on the Direct Response business over the past couple of years, we've really invested heavily there. I think -- just thinking big picture in terms of the contributors to accelerating to 20% from, I think, about 14% we're at today. ***Of course, we're going to continue the ongoing ad platform improvements. We've mentioned on the call, including larger and fresher models and better signal utilization.***

***I think in terms of the product road map and the product pieces, we've got a really good road map for our app goal-based bidding objectives, and for dynamic product ads as well that will land throughout the year.*** And then I think bringing Direct Response goal-based bidding objectives to new placements like Sponsored Snaps will also be a contributing factor as well.

\* \* \*

**Defendant Andersen**

. . . . On the China-based advertisers, we don't really break it down at that level of detail. We've not previously disclosed that market as a breakout market in our Qs and Ks. So in some ways, that perhaps is helpful in and of itself. And look, we're early in the quarter. We're only a few weeks in. You were [sic] continuing to grow as a business, but we've seen some headwinds thus far. I think it's early. And of course, there's a lot of quarter ahead of us and the macro uncertainty and how that's going to evolve over time. So we're going to keep watching it and monitoring the growth of the business and go from there. So hopefully, that gives you a little bit more color on the China base side of things.

22

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

* * *

**Kenneth James Gawrelski – Wells Fargo Securities, LLC – Equity Analyst**

Maybe first, you could talk a little bit about the kind of progression through the first quarter on the ad side. And as you go into April, any particular categories that you're seeing, or geographies that you're seeing changes in performance? Maybe we'll start there and 1 follow-up after that.

**Defendant Andersen**

*. . . . In terms of what we're seeing early here in the new quarter, we're just a few weeks in. It's very early in the going. As I said earlier, the business is continuing to grow, but we have seen some headwinds to start the quarter to the growth rate.* As I mentioned earlier, one example of a factor that we've seen as a driver there is some advertisers that have been impacted by the changes to the de minimis exemption. But as I also said earlier, it's really difficult, this early in the going, to parse the different drivers that can be impacting that. *So we're going to continue to watch it really carefully*. And of course, where we head from here on the macro and some of the factors there is also uncertain.

*So the key is that we stay focused on executing for our customers, improving the ad platform* and that we continue to be thoughtful about balancing our investment levels over time to make progress for the business financially. So hopefully, that gives you a little bit more color on your question.

* * *

**Benjamin Thomas Black – Deutsche Bank AG – Research Analyst**

You mentioned hitting 900 million DAUs and that you're approaching 1 billion yet. North America DAUs contracted sequentially. I know you've been working on a number of initiatives to restimulate growth in North America. So curious to hear what is potentially not working? And what gives you confidence that those trends can inflect positively again?

**Defendant Spiegel**

*. . . .* In North America, in particular, we sort of trended around this 100 million, 99 million DAU sort of number. *We're not expecting further declines here in Q2 in North America. And the things that sort of make us confident or that we're excited about are really the engagement around snapping that is so core to the service*, people making and sending snaps with their friends. So we've seen some positive trends there. We're continuing to build on those overall and then continuing to invest in the content business as well.

23

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

60. The statements identified above were materially false and misleading and omitted to state material adverse facts necessary to make the statements not misleading because they failed to disclose that: (i) Snap lacked reliable information concerning the Company's expected advertising revenue; (ii) potential headwinds attributed to macroeconomic risk and reduced visibility were more accurately caused by a significant issue with the Company's ad auction system; (iii) as a result of the foregoing issue, the Company's advertising growth rate declined in April and was significantly lower in the second quarter of 2025 than in the previous quarter.

### The Truth Emerges

61. On August 5, 2025, Snap reported disappointing second quarter 2025 financial results. Specifically, the Company revealed that advertising revenue decelerated significantly during the quarter. Defendant Andersen stated:

> As our global community continues to grow, we have continued to scale our top line with total revenue reaching $1.345 billion in Q2 and up 9% year-over-year. Our rate of top line growth was impacted by a number of factors in Q2, including *an issue related to our ad platform, the timing of Ramadan and the effects of the de minimis changes*. Unfortunately, in our efforts to improve advertiser performance, *we shipped a change that caused some campaigns to clear the auction at substantially reduced prices. We have since reverted this change and advertising revenue growth has improved as advertisers adjust their bid strategies to achieve their objectives.*
>
> Despite these headwinds, *advertising revenue reached $1.174 billion in Q2, up 4% year-over-year,* driven primarily by growth from DR advertising revenue, which increased 5% year-over-year.

62. Defendant Andersen elaborated on the issue with the Company's ad auction system:

> One of them certainly is the one you mentioned around the ad platform. We also had a factor around the timing of Ramadan, which was less of a benefit in Q2 than in the prior year. And as well, there was the impact of the de minimis changes in the quarter.
>
> * * *
>
> So if you recall, we grew ad revenue at a rate of approximately 9% in

24

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Q1. *And what we saw in April is that ad revenue growth declined to approximately 1% before largely recovering as we move through May and what you saw in May is, number one, we've gone to the work of reverting the ad platform change*, but also the factor around Ramadan obviously being diminished during that period of time. So we saw the recoveries we went through May.

\* \* \*

So the big focus at this point is building demand we have seen post the rollback of the ad change as we moved through June and into July. We've seen ad revenue specifically growing at a rate between 3% to 4% *so give you a sense of how the topography sort of moved from 9% in Q1 to approximately 1% ad revenue in April than to a rate of recovering largely in May and then we're looking at 3% to 4% plus the roll back to that change.*

63.    On this news, the price of Snap stock declined 17.15%, from a close of $9.39 per share on August 5, 2025 to a close of $7.78 per share on August 6, 2025.

64.    Analysts published negative reports in response to the foregoing disclosures. For example, Rosenblatt reported:

Snap's 2Q25 had an odd mishap. The company said an update to its ad auction system caused Snap to mistakenly auction ad inventory in April at a substantial, unintended discount, stalling ad growth at 1%, before the issue was fixed and ad growth stepped back up to ~ 4% for 2Q25. But even at this recovered pace, which is seen persisting in this zip code into 3Q25, ad growth is well below the 9% rise of 1Q25, and the 10% we had been estimating for 2Q25.

**Share Repurchases During the Relevant Period**

65.    According to the Company's public filings, while the price of Snap stock was artificially inflated due to the false and misleading statements detailed herein, the Individual Defendants caused the Company to repurchase approximately 4 million shares of Snap, for a total of roughly $33.3 million.

66.    Specifically, during May 2025, the Company repurchased 4,011,000 shares of Snap stock at an average price of $8.29 per share, for a total of $33,251,290.

67.    Given that the price of Snap stock was $7.78 per share after the corrective disclosures on August 6, 2025, the true value of the 4,011,000 repurchased shares was roughly $31.2 million. Accordingly, the Individual Defendants caused

25

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

the Company to overpay approximately $2.1 million to repurchase these shares.

## DAMAGE TO THE COMPANY

68.    As a direct and proximate result of the misconduct detailed above, the Company has incurred and will continue to incur significant financial losses, including but not limited to, the costs of defending against and incurring potential class-wide liability in the Securities Class Action.

69.    These damages also include the costs of remediating deficiencies in the Company's procedures and controls, costs incurred as a result of the Company repurchasing shares of Snap common stock at prices artificially inflated by the Individual Defendants' misleading statements, as well as compensation and benefits paid to current and former members of the Board and Company executives who breached their fiduciary duties to Snap.

70.    Furthermore, as a direct and proximate result of the misconduct detailed herein, Snap has also suffered and will continue to suffer a loss of reputation and goodwill, and be subject to a "liar's discount" that will plague the Company's stock price in the future due to the violations of federal and state law described above.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

71.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries it has suffered, and will continue to suffer, as a direct and proximate result of the Individual Defendants' miksconduct as alleged herein.

72.    Snap is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

73.    Plaintiff is a current shareholder of Snap and was a continuous shareholder of the Company during the period of the Individual Defendants' wrongdoing alleged herein. Plaintiff will adequately and fairly represent the interests

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

of the Company in enforcing and protecting its rights, and has retained counsel competent and experienced in derivative litigation.

74.    A pre-suit demand on the Board of Snap is futile and, therefore, excused. At the time this action was commenced, the eleven-member Board was comprised of Defendants Spiegel, Murphy, Lynton, Coffey, Coles, Jenkins, Lanzone, Miller, Spence, Thorpe, and Vargas (the "Director Defendants"). Accordingly, Plaintiff is only required to show that six Directors cannot exercise disinterested business judgment about whether to pursue the claims asserted in this action. As set forth below, all of the Board's current members are incapable of exercising disinterested business judgment about whether to institute and prosecute the claims asserted in this action because they face a substantial likelihood of liability herein and/or in the Securities Class Action and, therefore, demand on the Board would have been a futile act.

75.    Defendant Spiegel is not disinterested and, therefore, is incapable of considering a demand, because he is named as a defendant, and faces significant personal liability, in the Securities Class Action for substantially the same wrongdoing alleged herein. Specifically, while touting Snap's advertising platform and revenue prospects during the 1Q25 Earnings Call, Defendant Spiegel failed to disclose that Snap lacked reliable information concerning the Company's expected advertising revenue, and that potential headwinds attributed to macroeconomic risk and reduced visibility were, in fact, the result of a significant issue with the Company's ad auction system, which caused the Company's advertising growth rate to decline in April.

76.    Moreover, because of Defendant Spiegel's potential personal liability in the Securities Class Action, and because he was Snap's majority shareholder who exercised 53.1% of the voting control over the Company, the other Director

27

Defendants could not exercise disinterested business judgment to pursue claims that would jeopardize Defendant Spiegel's defense in the Securities Class Action, exposing him to personal class-wide liability, without jeopardizing their own positions on Snap's Board.

77.     In addition, the Director Defendants knew, or recklessly disregarded, that materially false and misleading statements were issued by and/or on behalf of the Company, and either caused, or acquiesced in the issuance of such statements, and participated in efforts to conceal those wrongs from the Company's stockholders.

78.     Furthermore, the Director Defendants willfully ignored, and/or recklessly failed to inform themselves of the existence of, obvious "red flags" concerning the adequacy of the Company's internal controls, practices, and procedures, and each failed to make a good faith effort to remediate those deficiencies or to prevent the recurrence of the problems caused thereby.

79.     Defendants Lynton, Coffey, Jenkins, Miller, and Thorpe served on the Company's Audit Committee during the Relevant Period (the "Audit Defendants") and, pursuant to the Audit Committee Charter, were specifically charged with the responsibility to assist the Board in fulfilling its oversight responsibilities related to, *inter alia*, financial accounting and reporting, the underlying internal controls and procedures over financial reporting, and the audits of the financial statements. At all relevant times, however, the Audit Defendants breached their fiduciary duty to the Company by failing to prevent, correct, or inform the Board of the issuance of material misstatements and omissions regarding the Company's business and the adequacy of its internal controls as alleged above. Therefore, the Audit Defendants cannot independently consider any demand to sue themselves or each other for breaching their fiduciary duties to the Company, as that would expose them to

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

substantial liability and threaten their livelihoods.

80.     The Director Defendants, as members of the Board, were and are subject to the Company's Code of Conduct. The Code of Conduct goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations, requiring the Directors to also adhere to the Company's standards of business conduct. The Director Defendants violated the Code of Conduct because they knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. Because the Director Defendants violated the Code of Conduct, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

81.     All of the Board's current members derive substantial revenue from the Company, control the Company, and are indebted to each other. These conflicts of interest have precluded the Board's current members from calling into question the Director Defendants' conduct. Significantly, none of the Board's current members have taken remedial action to redress the misconduct alleged herein.

82.     The Director Defendants' misconduct alleged herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal actions. Thus, none of the directors can claim exculpation from their violations of duty pursuant to the Company's charter. As a majority of the directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein. They cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as futile.

83.     The acts complained of herein constitute violations of fiduciary duties

owed by Snap's officers and directors, and these acts are incapable of ratification.

84. The Individual Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds i.e., monies belonging to the stockholders of Snap. If there is a directors' and officers' liability insurance policy covering the Individual Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Individual Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director Defendants were to sue themselves or certain officers of Snap, there would be no directors' and officers' insurance protection. Accordingly, the Director Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director Defendants is futile and, therefore, excused.

85. If there is no directors' and officers' liability insurance, then the directors will not cause Snap to sue the Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event as well.

86. Thus, for all of the reasons set forth above, all of Snap's current directors are unable to consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

30
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## COUNT I
### Against the Individual Defendants for Violations of § 10(b) of the Exchange Act, 15 U.S.C. § 78(j), and Rule 10b-5, 17 C.F.R. § 240.10b-5

87.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully alleged herein.

88.    The Individual Defendants participated in a scheme with the purpose and effect of defrauding Snap. Not only is Snap now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, in the Securities Class Action but the Company itself is also one of the largest victims of the unlawful scheme perpetrated by the Individual Defendants.

89.    During the Relevant Period, the Individual Defendants caused the Company to overpay by approximately $2.1 million to repurchase 4,011,000 shares.

90.    The Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements, and periodic and current reports filed with the SEC.

91.    The Individual Defendants employed devices, schemes, and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Snap not misleading.

92.    The Individual Defendants, as directors and officers of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as directors and officers of the Company, the Individual Defendants were able to and did control the conduct complained of herein

31

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

and the content of the public statements disseminated by Snap.

93.    The Individual Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the scheme and the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the scheme set forth herein and for the false and misleading statements and/or omissions disseminated to the public through filings with the SEC.

94.    By virtue of the foregoing, the Individual Defendants have violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II
### Against the Individual Defendants
### For Breach of Fiduciary Duty

95.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully alleged herein.

96.    The Individual Defendants owed the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

97.    The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

98.    The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by failing to implement and monitor adequate internal controls over the Company's financial reporting and, as a consequence, issuing or permitting the issuance of

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

materially false and misleading statements in the Company's SEC filings and other public disclosures. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

99.     As a direct and proximate result of the Individual Defendants' failure to fulfill their fiduciary obligations, the Company has sustained significant damages.

100.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company. As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs incurred in defending itself in the Securities Class Action, exposing the Company to millions of dollars in potential class-wide damages in the Securities Class Action, and damage to the share price of the Company's stock, resulting in an increased cost of capital, and reputational harm.

## COUNT III
### Against the Individual Defendants for Aiding and Abetting Breach of Fiduciary Duty

101.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully alleged herein.

102.    By encouraging and accomplishing the illegal and improper transactions alleged herein and concealing them from the public, the Individual Defendants have each encouraged, facilitated, and advanced their breach of their fiduciary duties. In so doing, the Individual Defendants have each aided and abetted, conspired, and schemed with one another to breach their fiduciary duties, waste the Company's corporate assets, and engage in the ultra vires and illegal conduct complained of herein.

33

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

103.   Plaintiff, on behalf of Snap, has no adequate remedy at law.

**COUNT IV**
**Against the Individual Defendants**
**For Unjust Enrichment**

104.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully alleged herein.

105.   By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Snap.

106.   The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Snap that were tied to the performance or artificially inflated valuation of Snap, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

107.   Plaintiff, as a shareholder and a representative of Snap, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits and other compensation procured by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

108.   Plaintiff, on behalf of Snap, has no adequate remedy at law.

**COUNT V**
**Against the Individual Defendants**
**For Waste of Corporate Assets**

109.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully alleged herein.

110.   The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the

34
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

time period in issue.  It resulted in continuous, connected, and ongoing harm to the Company.

111.  As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (i) paying and collecting excessive compensation and bonuses; and (ii) incurring potentially millions of dollars of legal liability and/or legal costs, including defending the Company and its officers against the Securities Class Action.

112.  As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

113.  Plaintiff, on behalf Snap, has no adequate remedy at law.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment as follows:

A.  Awarding money damages against all Individual Defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, molded in a fashion to ensure the Individual Defendants do not participate therein or benefit thereby;

B.  Directing all Individual Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds, and imposing a constructive trust thereon;

C.  Directing Snap to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Snap and its stockholders from a repeat of the damaging events described herein, including, but not limited to:

35

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

- strengthening the Board's supervision of operations and compliance with applicable state and federal laws and regulations;

- strengthening the Company's internal reporting and financial disclosure controls;

- developing and implementing procedures for greater stockholder input into the policies and guidelines of the Board; and

- strengthening the Company's internal operational control functions.

D.    Awarding punitive damages;

E.    Awarding costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.    Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: August 29, 2025

**RIGRODSKY LAW, P.A.**

By:    /s/ Gina M. Serra
Gina M. Serra (#361172)
1091 N. Palm Canyon Drive, Suite 9
Palm Springs, CA 92262
Telephone: (760) 406-8009
Facsimile: (302) 654-7530
Email: gms@rl-legal.com

**OF COUNSEL:**

Timothy J. MacFall
Samir Aougab
825 East Gate Boulevard, Suite 300
Garden City, NY 11530
Telephone: (516) 683-3516
Email: tjm@rl-legal.com
Email: sa@rl-legal.com

**GRABAR LAW OFFICE**
Joshua H. Grabar
One Liberty Place
1650 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: (267) 507-6085
Email: jgrabar@grabarlaw.com

*Attorneys for Plaintiff*

36
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT